# EXHIBIT 3

Trials@uspto.gov

571-272-7822

Paper 38

Entered:  September 28, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

FUJITSU NETWORK COMMUNICATIONS, INC.,
CORIANT OPERATIONS, INC., CORIANT (USA) INC., and
CIENA CORPORATION
Petitioner,

v.

CAPELLA PHOTONICS, INC.,
Patent Owner.

_____

Cases IPR2015-00726[1]
Patent RE42,368 E

_____

Before JOSIAH C. COCKS, KALYAN K. DESHPANDE, and
JAMES A. TARTAL, *Administrative Patent Judges.*

TARTAL, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)* and *37 C.F.R. § 42.73*

---

[1] IPR2015-01958 was joined with IPR2015-00726 on April 1, 2016, by
Order in IPR2015-01958, Paper 11 (IPR2015-00726, Paper 28).

Capella_Infinera_000051408

IPR2015-00726
Patent RE42,368 E

## I.     INTRODUCTION

Petitioner, Fujitsu Network Communications, Inc., Coriant
Operations, Inc., Coriant (USA) Inc., and Ciena Corporation filed petitions
requesting an *inter partes* review of claims 1–6, 9–12, and 15–22 of U.S.
Patent No. RE42,368 (Ex. 1001, "the '368 patent").  Paper 5 ("Petition" or
"Pet."); *see also* IPR2015-01958, Paper 4.

Claims 1–6, 9–13, and 15–22 of the '368 patent were previously held
to be unpatentable in *Cisco Systems, Inc., Ciena Corporation, Coriant
Operations, Inc., Coriant (USA) Inc., and Fujitsu Network Communications,
Inc., v. Capella Photonics, Inc.*, IPR2014-01166, (PTAB Jan. 28, 2016)
(Paper 44) (the '1166 case).  The grounds of unpatentability asserted by
Petitioner in this case rely on prior art, evidence, and arguments not asserted
in the '1166 case.  Likewise, Patent Owner, Capella Photonics, Inc.,
advances arguments and evidence in response in this case that were not
asserted by Patent Owner in the '1166 case.

Based on the information provided in the Petition, and in
consideration of the Preliminary Response (Paper 10) of Patent Owner, we
instituted a trial pursuant to 35 U.S.C. § 314(a) of: (1) claims 1, 2, 5, 6, 9–
12, and 15–21 as obvious over Bouevitch[2] and Carr[3] under 35 U.S.C.
§ 103(a); and, (2) claims 1–4, 17, and 22 as obvious over Bouevitch and
Sparks[4] under 35 U.S.C. § 103(a).  Paper 11 ("Institution Decision"); *see
also* IPR2015-01958, Paper 11.

---

[2] U.S. Patent No. 6,498,872 B2, issued Dec. 24, 2002 (Ex. 1002,
"Bouevitch")
[3] U.S. Patent No. 6,442,307 B1, issued Aug. 27, 2002 (Ex. 1005, "Carr").
[4] U.S. Patent No. 6,625,340 B1, issued Sep. 23, 2003 (Ex. 1006, "Sparks")

2

Capella_Infinera_000051409

IPR2015-00726
Patent RE42,368 E

After institution of trial, Patent Owner filed a Response (Paper 22, "Response" or "PO Resp.") and Petitioner filed a Reply (Paper 27, "Pet. Reply").  The Petition is supported by the Declaration of Joseph E. Ford, Ph.D. (Ex. 1037). [5]  The Response is supported by the Declaration of Dr. Alexander V. Sergienko (Ex. 2033).

A transcript of the Oral Hearing conducted on May 24, 2016, is entered as Paper 37 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons that follow, Petitioner has shown by

---

[5] At the time of filing, the Petition was supported by the Declaration of Timothy J. Drabik, Ph.D.  Ex. 1016.  After institution of trial, and prior to his deposition, Dr. Drabik passed away. *See* Paper 17.  Over the opposition of Patent Owner, Petitioner's motion to file as supplemental information the Declaration of Joseph E. Ford in support of the petition was granted (Paper 19), and Patent Owner's Request for Reconsideration of that decision was denied (Paper 23).  Patent Owner's further attempts to obtain additional discovery of Dr. Drabik's "notes, comments, and edits" after his death were denied as not relevant to this proceeding as Petitioner no longer relies on Dr. Drabik's declaration as support for the Petition.  Paper 26.  Patent Owner was informed that "the panel will not consider the content of [Dr. Drabik's] Declaration as a part of any Final Written Decision."  Paper 19, 4.  Patent Owner further argues that Dr. Ford's testimony is based on hindsight reasoning and bias, and should be given little if any weight because Patent Owner was unable to depose Dr. Drabik before his death and a paper published by Dr. Ford purportedly conflicts with Dr. Ford's declaration as it "does not cite to a single reference about wavelength-selective switches that pre-date [Patent Owner's] 2001 priority date."  PO Resp. 43–49.  We have considered each of Patent Owner's arguments and reiterate that Patent Owner had the opportunity to cross-examine Dr. Ford prior to filing its Patent Owner Response.  We are not persuaded that Dr. Ford's testimony should be afforded little or no weight based on the arguments asserted by Patent Owner.

3

IPR2015-00726
Patent RE42,368 E

a preponderance of the evidence that claims 1–6, 9–12, and 15–22 of the
'368 patent are unpatentable.

## II.    BACKGROUND

### A.    The '368 patent (Ex. 1001)

The '368 patent, titled "Reconfigurable Optical Add-Drop
Multiplexers with Servo Control and Dynamic Spectral Power Management
Capabilities," reissued May 17, 2011, from U.S. Patent No. 6,879,750
("the '750 patent"). Ex. 1001. The '750 patent issued April 12, 2005, from
application number 10/745,364, filed December 22, 2003.

According to the '368 patent, "fiber-optic communications networks
commonly employ wavelength division multiplexing (WDM), for it allows
multiple information (or data) channels to be simultaneously transmitted on
a single optical fiber by using different wavelengths and thereby
significantly enhances the information-bandwidth of the fiber." *Id.* at 1:37–
42. An optical add-drop multiplexer (OADM) is used both to remove
wavelengths selectively from a multiplicity of wavelengths on an optical
fiber (taking away one or more data channels from the traffic stream on the
fiber) and to add wavelengths back onto the fiber (inserting new data
channels in the same stream of traffic). *Id.* at 1:45–51.

The '368 patent describes a "wavelength-separating-routing (WSR)
apparatus that uses a diffraction grating to separate a multi-wavelength
optical signal by wavelength into multiple spectral channels, which are then
focused onto an array of corresponding channel micromirrors." *Id.* at
Abstract. "The channel micromirrors are individually controllable and
continuously pivotable to reflect the spectral channels into selected output

4

Capella_Infinera_000051411

IPR2015-00726
Patent RE42,368 E

ports." *Id.* According to Petitioner, the small, tilting mirrors are sometimes called Micro Electro Mechanical Systems or "MEMS." Pet. 6. The WSR described in the '368 patent may be used to construct dynamically reconfigurable OADMs for WDM optical networking applications. *Id.*

Figure 1A of the '368 patent is reproduced below.



Fig. 1A

Figure 1A depicts wavelength-separating-routing (WSR) apparatus 100, in accordance with the '368 patent. WSR apparatus 100 is comprised of an array of fiber collimators 110 (multiple input/output ports, including input port 110-1 and output ports 110-2 through 110-N), diffraction grating 101 (a wavelength separator), quarter wave plate 104, focusing lens 102 (a beam-focuser), and array of channel micromirrors 103. Ex. 1001, 6:57–63, 7:55–56.

A multi-wavelength optical signal emerges from input port 110-1 and is separated into multiple spectral channels by diffraction grating 101, which are then focused by focusing lens 102 into a spatial array of distinct spectral spots (not shown). *Id.* at 6:64–7:2. Channel micromirrors 103 are

5

Capella_Infinera_000051412

IPR2015-00726
Patent RE42,368 E

positioned such that each channel micromirror receives one of the spectral channels.

Figure 1B of the '368 patent is reproduced below.



**Fig. 1B**

Figure 1B depicts a close-up view of the array of channel micromirrors 103 shown above in Figure 1A. *Id.* at 8:6–7. The channel micromirrors "are individually controllable and movable, e.g. pivotable (or rotatable) under analog (or continuous) control, such that, upon reflection, the spectral channels are directed" into selected output ports by way of focusing lens 102 and diffraction grating 101. *Id.* at 7:6–11. According to the '368 patent:

> each micromirror may be pivoted about one or two axes. What is important is that the pivoting (or rotational) motion of each channel micromirror be individually controllable in an analog manner, whereby the pivoting angle can be continuously adjusted so as to enable the channel micromirror to scan a spectral channel across all possible output ports.

*Id.* at 9:8–14.

6

Capella_Infinera_000051413

IPR2015-00726
Patent RE42,368 E

Figure 3 of the '368 patent is reproduced below.



**Fig. 3**

Similar to Figure 1A, above, Figure 3 also shows a WSR apparatus as described by the '368 patent. Ex. 1001, 10:25–26. In this embodiment, two-dimensional array of fiber collimators 350 provides an input port and plurality of output ports. *Id.* at 10:31–32. First and second two-dimensional arrays of imaging lenses 360, 370 are placed in a telecentric arrangement between two-dimensional collimator-alignment mirror array 320 and two-dimensional fiber collimator array 350. *Id.* at 10:37–43. "The channel micromirrors 103 must be pivotable biaxially in this case (in order to direct its corresponding spectral channel to anyone of the output ports)." *Id.* at 10:43–46.

The WSR also may incorporate a servo-control assembly (together termed a "WSR-S apparatus"). *Id.* at 4:65–67. According to the '368 patent:

> The servo-control assembly serves to monitor the power levels of the spectral channels coupled into the output ports and further provide control of the channel micromirrors on an individual basis, so as to maintain a predetermined coupling efficiency of

7

IPR2015-00726
Patent RE42,368 E

> each spectral channel in one of the output ports. As such, the
> servo-control assembly provides dynamic control of the coupling
> of the spectral channels into the respective output ports and
> actively manages the power levels of the spectral channels
> coupled into the output ports.

*Id.* at 4:47–56.

Figure 5 of the '368 patent is reproduced below.



**Fig. 5**

Figure 5 depicts OADM 500 in accordance with the '368 patent composed

of WSR-S (or WSR) apparatus 510 and optical combiner 550. *Id.* at 12:40–

44. Input port 520 transmits a multi-wavelength optical signal, which is

separated and routed into a plurality of output ports, including pass-through

port 530 and one or more drop ports 540-1 through 540-N. *Id.* at 12:44–48.

Pass-through port 530 is optically coupled to optical combiner 550, which

combines the pass-through spectral channels with one or more add spectral

channels provided by one or more add ports 560-1 through 560-M. *Id.* at

12:52–56. The combined optical signal is then routed into an existing port

570, providing an output multi-wavelength optical signal. *Id.* at 12:56–58.

8

IPR2015-00726
Patent RE42,368 E

#### B.   Illustrative Claims

Challenged claims 1, 15, 16, and 17 of the '368 patent are independent.  Claims 2–6 and 9–12 ultimately depend from claim 1 and claims 18–22 ultimately depend from claim 17.  Claims 1 and 17 of the '368 patent are illustrative of the claims at issue:

> 1.   An optical add-drop apparatus comprising
> an input port for an input multi-wavelength optical signal having first spectral channels;
> one or more other ports for second spectral channels; an output port for an output multi-wavelength optical signal;
> a wavelength-selective device for spatially separating said spectral channels; [and]
> a spatial array of beam-deflecting elements positioned such that each element receives a corresponding one of said spectral channels, each of said elements being individually and continuously controllable *in two dimensions* to reflect its corresponding spectral channel to a selected one of said ports *and to control the power of the spectral channel reflected to said selected port.*

Ex. 1001, 14:6–20.

> 17.   A method of performing dynamic add and drop in a WDM optical network, comprising
> separating an input multi-wavelength optical signal into spectral channels;
> imaging each of said spectral channels onto a corresponding beam-deflecting element; and
> controlling dynamically and continuously said beam-deflecting elements *in two dimensions* so as to combine selected ones of said spectral channels into an output multi-wavelength optical signal *and to control the power of the spectral channels combined into said output multi-wavelength optical signal.*

Ex. 1001, 16:3–14.

9

Capella_Infinera_000051416

IPR2015-00726
Patent RE42,368 E

## III.   ANALYSIS

### A.   Claim Construction

The Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b). We presume a claim term carries its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question" at the time of the invention. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). A patentee may, however, act as their own lexicographer and give a term a particular meaning in the Specification, but must do so with "reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Only terms which are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

1.   "continuously controllable"

Claim 1 requires "a spatial array of beam-deflecting elements . . . each of said elements being individually and continuously controllable." Similarly, claim 17 requires "controlling dynamically and continuously said beam-deflecting elements." Petitioner asserts that "continuously controllable" should be construed to mean "under analog control." Pet. 9–10. Petitioner identifies the following disclosures of the '368 patent as supporting its proposed construction:

> The patent explains that "[a] distinct feature of the channel micromirrors in the present invention, in contrast to those used in the prior art, is that the motion . . . of each channel micromirror

10

IPR2015-00726
Patent RE42,368 E

is under ***analog control*** such that its pivoting angle can be ***continuously adjusted***." ([Ex. 1001], 4:7–11; emphasis added). Another passage in the specification states that "[w]hat is important is that the pivoting (or rotational) motion of each channel micromirror be individually ***controllable in an analog manner***, whereby the pivoting angle can be continuously adjusted so as to enable the channel micromirror to scan a spectral channel across all possible output ports." (*Id.*, 9:9–14; emphasis added).  Yet another passage states that "channel micromirrors 103 are individually controllable and movable, e.g., pivotable (or rotatable) under analog (or continuous) control." (*Id.*, 7:6–8).

Pet. 10.

Dr. Ford also explains that "[e]lectrostatically driven MEMS mirrors may be driven with an analog voltage for continuous positioning control," and states that a person of ordinary skill in the art "would have known that MEMS mirrors based on analog voltage control can be tilted to any desired angle in their operating range." Ex. 1037 ¶¶ 57, 157.

Patent Owner contends that no express construction should be given to any claim term. PO Resp. 19.  Additionally, according to Dr. Sergienko, "[a]nalog controlled mirrors can operate under continuous control." Ex. 2033 ¶ 48.  However, there is no evidence that analog controlled mirrors always operate under continuous control or that only analog mirrors operate under continuous control.

Accordingly, based on all of the evidence presented, we are not persuaded that "continuously controllable" is limited to "analog control" or that "analog control" necessarily corresponds to "continuous" control under all circumstances.  We determine that "continuously controllable," in light of

11

Capella_Infinera_000051418

IPR2015-00726
Patent RE42,368 E

the specification of the '368 patent, encompasses "under analog control such
that it can be continuously adjusted."

    2.    "port"

    Claim 1 requires "an input port . . . one or more other ports. . . [and]
an output port."  Patent Owner contends that in the '368 patent, the recited at
least three ports are all structurally described as "fiber collimators."
PO Resp. 38.  Patent Owner, however, offers no definition of "port," and
does not suggest that the '368 patent provides an express definition of the
term.  Instead Patent Owner argues that "[n]owhere in the '368 patent or the
prosecution history is there an indication that the ports are to be construed to
encompass circulator ports."  *Id.* at 39.  We disagree.

    There is no dispute that the ordinary and customary meaning of "port"
encompasses circulator ports, and, indeed, any "point of entry or exit of
light."  *See* Dr. Sergienko Deposition Transcript (Ex. 1041), 43:16–23,
45:12–13 ("The circulator ports are ports with constraints.").  Nor does the
'368 patent equate the term "port" to "collimator," as both "port" and
"collimator" appear separately in the claims of the '368 patent.  Ex. 1001,
14:7, 14:48–51.  We have considered the testimony of Dr. Sergienko as well
(Ex. 2033 ¶¶ 102–123), and find that even if certain fiber collimators serve
as ports in the '368 patent, that does not redefine the term "port" to mean
"collimator."  *See id.* ¶ 102.

    Although the broad scope of a claim term may be intentionally
disavowed, "this intention must be clear," *see Teleflex, Inc. v. Ficosa N. Am.
Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The patentee may
demonstrate an intent to deviate from the ordinary and accustomed meaning

12

Capella_Infinera_000051419

IPR2015-00726
Patent RE42,368 E

of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "However, this intention must be clear, and cannot draw limitations into the claim from a preferred embodiment." *Conoco, Inc. v. Energy & Envtl. Int'l.*, 460 F.3d 1349, 1357–58 (Fed. Cir. 2006).

Patent Owner fails to show any expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope with respect to the use of "port" in the '368 patent.  Patent Owner argues that "[t]he inventors of the '368 patent realized that including optical circulators in an OADM was a significant drawback," and that "the claimed ROADMs do not require circulators."  PO Resp. 12, 14.  Patent Owner further argues that by looking at the specification "as a whole," the '368 patent employs fiber collimators as ports, and that the prosecution history does not indicate "that the ports are to be construed to encompass circulator ports." *Id.* at 39.  To the contrary, Petitioner demonstrates that a provisional application to the '368 patent in fact uses circulator ports as "ports."  Pet. Reply 19–20 (citing Ex. 2012, 4, Fig. 9).  We have considered all of the arguments advanced by Patent Owner in its effort to redefine "port" as excluding "circulator ports" (PO Resp. 38–45) and find insufficient support for Patent Owner's contention that the '368 patent disavows or otherwise precludes circulator ports from the scope of the term "port."  We determine that "port," in light of the specification of the '368 patent, encompasses "circulator port."

3.    Additional Claim Terms

Petitioner addresses several additional claim terms, including "in two dimensions," "beam-deflecting elements," and "servo-control assembly."

13

Capella_Infinera_000051420

IPR2015-00726
Patent RE42,368 E

Pet. 8–13.  Patent Owner contends that no term requires express construction.  PO Resp. 19.  For purposes of this decision, no express construction of any additional claim terms is necessary.

*B.    References Asserted as Prior Art*

Petitioner relies on Bouevitch, Carr, and Sparks with respect to its assertion that the challenged claims would have been obvious.

### 1.    Bouevitch

Bouevitch describes an optical device for rerouting and modifying an optical signal, including modifying means such as a MEMS array and a liquid crystal array which function as an attenuator when the device operates as a dynamic gain equalizer (DGE), and as a switching array when the device operates as a configurable optical add/drop multiplexer (COADM). Ex. 1002, Abstract.  According to Petitioner, the COADM described in Bouevitch "uses MEMS mirrors with one axis of rotation."  Pet. 25.

### 2.    Carr

Carr describes a MEMS mirror device comprised of a mirror movably coupled to a frame and an actuator for moving the mirror.  Ex. 1005, Abstract.  Petitioner contends "Carr discloses a two-dimensional array of double-gimbaled mirrors that can be tilted about two perpendicular torsion bars to any desired orientation," as well as power control or attenuation by tilting the MEMS mirrors such that only a portion of input signals enter the output fibers.  Pet. 25 (citing Ex. 1005, 3:44–47, 3:66–4:2, 11:13–20).

### 3.    Sparks

Sparks describes an optical switch arranged to misalign the optical beam path to provide a predetermined optical output power.  Ex. 1006,

14

Capella_Infinera_000051421

IPR2015-00726
Patent RE42,368 E

Abstract.  According to Sparks, "[t]he system operates by controlling the movable micromirrors (16, 26), which are fabricated using MEMS technology and are capable of two axis movement, to carefully align the beams so as to ensure that the maximum possible input optical signal is received at the output of the switch." *Id.* at 4:43–46.

C.    *Asserted Obviousness Over Bouevitch and Carr*

Petitioner asserts that claims 1, 2, 5, 6, 9–12, and 15–21 would have been obvious over Bouevitch and Carr.  Pet. 24–47.

1.    Claim 1

Claim 1, directed to an optical add-drop apparatus, requires "an input port . . . one or more other ports . . . [and] an output port."  Petitioner asserts that Bouevitch discloses an optical add-drop apparatus, including an input port, one or more other ports (labeled 80b "IN ADD" and "OUT DROP") and an output port (labeled "OUT EXPRESS"), as recited by claim 1 of the '368 patent.  Pet. 32–33 (citing Ex. 1002, 14:36–44, 14:55–15:1, Fig. 11).  Petitioner's contentions are supported by Dr. Ford.  Ex. 1037 ¶ 151.

Patent Owner argues that, under its proposed claim construction of "port," Bouevitch discloses at most two ports because the '368 patent equates "port" to "collimator."  PO Resp. 36–42.  For the reasons explained above in our claim construction analysis for "port," we reject Patent Owner's claim construction for "port."  Failing to provide any meaning to a term, "port," and then arguing that the term nevertheless fails to encompass a certain structure in the prior art (a structure Patent Owner's own experts identifies as a "port") is not persuasive.  *See* Ex. 1041, 45:12–13.  Accordingly, we do not agree with Patent Owner's contention that the only

15

Capella_Infinera_000051422

IPR2015-00726
Patent RE42,368 E

ports disclosed by Bouevitch are collimator lenses 12a and 12b. *See* PO Resp. at 40–42. Petitioner has shown, as discussed above and as supported by Dr. Ford, that Bouevitch discloses the recited input, output, and one or more other ports, as recited by claim 1.

Patent Owner does not dispute Petitioner's contention that Carr and Bouevitch together disclose the remaining limitations of claim 1. In particular, claim 1 requires "a wavelength-selective device" for spatially separating spectral channels. Petitioner identifies diffraction grating 20 of Bouevitch as corresponding to the recited "wavelength-selective device." Pet. 34. Claim 1 also requires "a spatial array of beam-deflecting elements." Petitioner identifies MEMS mirror array 50 of Bouevitch as corresponding to the recited "spatial array of beam-deflecting elements positioned such that each element receives a corresponding one of said spectral channels." Pet. 34 (citing Ex. 1002, 14:48–55).

Petitioner also identifies the two-dimensional array of movable gimballed mirrors shown in Carr Figures 1a and 2b as corresponding to the claimed "spatial array of beam-deflecting elements." Pet. 34–36. For each of the beam-deflecting elements, claim 1 further requires that they be "individually and continuously controllable *in two dimensions* to reflect its corresponding spectral channel to a selected one of said ports *and to control the power of the spectral channel reflected to said selected port*." Petitioner identifies the double gimballed mirror 21 which "can be tilted to any desired orientation." Pet. 34–35 (quoting Ex. 1005, 3:47–48). Carr further discloses intentional misalignment for power control. *See id.* at 35–36 (quoting Ex. 1005, 11:11–23, *see also* Fig. 9). As Explained by Dr. Ford, "Carr discloses

16

Capella_Infinera_000051423

IPR2015-00726
Patent RE42,368 E

effecting closed-loop power control or attenuation by tilting MEMS mirrors to introduce misalignment of channel wavelength beams," and "Carr specifically teaches that its analog, continuously controlled micromirrors would be useful for power control applications in WDM systems."  Ex. 1037 ¶¶ 139, 145.  In summary, for the reasons discussed above, we agree with Petitioner that Bouevitch and Carr disclose all of the recited limitations of claim 1.  *See* Pet. 31–36.  Thus, the remaining issue is whether Petitioner has provided "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).[6]

With respect to a rationale for combining Bouevitch and Carr, Petitioner contends that the use of the two-axis mirror of Carr in Bouevitch: (1) is the use of a known technique to improve similar devices, (2) is a simple substitution of one known element for another yielding predictable results, and (3) would be obvious to try as there are only two options for tilting MEMS mirrors: one-axis and two-axis mirrors.  Pet. 26–28.  In particular, Petitioner explains that "providing the MEMS mirrors of Bouevitch with two-axis tilt capability enables the spatial positioning of

---

[6] The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) secondary considerations, i.e. objective evidence of unobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We have considered each of the Graham factors and incorporate our discussion of those considerations, to the extent there is a dispute, in our evaluation of the reasoning that supports the asserted combination. We further observe that, in this proceeding, evidence of secondary considerations has not been offered for evaluation.

Capella_Infinera_000051424

IPR2015-00726
Patent RE42,368 E

returning beams in both transverse directions at the face of microlens array
12," thereby reducing errors in system alignment. *Id.* Petitioner's rationale
for combining Bouevitch and Carr is supported by Dr. Ford. Ex. 1037
¶¶ 141–144 (stating, for example, that "[t]here are only two options for
tilting MEMS mirrors: one-axis and two-axis mirrors" and that "[b]ecause
Carr already disclosed the use of two-axis mirrors (which were available by
the '368 Patent's priority date), a [person having ordinary skill in the art]
would have a high expectation of success upon trying two-axis mirror
control in Bouevitch.")

Patent Owner disputes the sufficiency of the rationale provided in the
Petition. PO Resp. 23–36. Petitioner demonstrates that the thrust of Patent
Owner's arguments do not refute Petitioner's contentions, but instead argue
that the asserted combination would not have been obvious for other
reasons. *See* Pet. Reply 12–13 (citing Ex. 1040 (noting that Dr. Sergienko
agreed that two-axis mirrors were known in the art and provided certain
benefits over single axis mirrors)).

First, Patent Owner argues that a person of ordinary skill "would have
never used two-axis mirrors in Bouevitch's system to control power through
intentional misalignment, because doing so would destroy Bouevitch's
principle of operation." PO Resp. 24. Patent Owner contends that
Bouevitch discloses "a *folded* 4-*f* system that autocorrects for any
unintentional misalignments" and that this advantage would be lost if
combined with Carr because Carr controls power through "*intentional*
misalignment." *Id.* at 26–27. Patent Owner further argues that Bouevitch

18

Capella_Infinera_000051425

IPR2015-00726
Patent RE42,368 E

"uses a different method to control power . . . by attenuation at the MEMS devices, not intentional misalignment." *Id.* at 28.

There is no dispute that Bouevitch discloses methods other than misalignment for power control.  We agree with Petitioner, however, that Bouevitch "recognizes that the degree of attenuation may be based on the angle of deflection off each MEMS mirror."  Pet. 30 (citing Ex. 1002, 7:31–37 (stating that the "degree of attenuation is based on the degree of deflection provided by the reflector (i.e., the angle of reflection)")).  Patent Owner argues in response that Bouevitch is referring to "constructive or destructive interference," not misalignment.  PO Resp. 29.  In reply, Petitioner notes that Dr. Sergienko was unable to identify any portion of Bouevitch to support Patent Owner's theory of attenuation based on interference.  Pet. Reply 8 (citing Ex. 1040, 90:8–22).  Indeed, the paragraph cited by Patent Owner from Dr. Sergienko's declaration in support of the assertion that Bouevitch "refers" to power control through interference, in fact, says no such thing.  PO Resp. 29 (citing Ex. 2033 ¶ 99 (stating that Bouevitch refers to modifying means for power control and that another reference (Ex. 2031) illustrates power control through interference)).  We find persuasive Petitioner's explanation that had Bouevitch intended to refer to interference-based attenuation instead of angular misalignment, then Bouevitch would have addressed altering distances, not angles of tilt.  *See* Pet. Reply 8–10 (citing Ex. 1040, 126:9–127:7) (explaining that Mechanical Anti-Reflection Switch (MARS) modulator device operates in a 'surface-normal manner' by vertically moving the partially reflective membrane," and noting that Dr. Sergienko agreed that the MARS device does not vary

19

IPR2015-00726
Patent RE42,368 E

the angle of reflection).  We further see no inconsistency between
Bouevitch's disclosure of methods to prevent *unintentional* misalignment
with other methods that incorporate *intentional* misalignment for power
control.  The prior art's mere disclosure of more than one alternative does
not constitute a teaching away from any of these alternatives because such
disclosure does not criticize, discredit, or otherwise discourage the solution
claimed in the . . . application." *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir.
2004).  For the same reasons we are not persuaded that applying intentional
misalignment for power control as disclosed by Carr would destroy
Bouevitch's principle of operation.

Second, Patent Owner argues that Petitioner's combination of
Bouevitch and Carr is improper hindsight because it relies on knowledge
beyond the level of ordinary skill at the time of the claimed invention and
includes knowledge gleaned only from the applicant's disclosure.  PO Resp.
31–36.  Patent Owner argues that "Dr. Ford assumed wavelength-selective
switches were known at the time of the invention, when, in fact, they were
not." *Id.* at 31.  Patent Owner's argument is premised on its contention that
Dr. Ford published a paper in 2006 which did not contain any citations "to
confirm that wavelength-selective switches were known when the '368
patent was filed." *Id.* at 32.  Patent Owner's argument is not persuasive
evidence that wavelength switches were unknown at the relevant time.  To
the contrary, Dr. Ford's declaration in this proceeding identifies references
supporting the contention that wavelength-selective switches were known
and described prior to Patent Owner's priority date.  *See* Ex. 1037 ¶ 52
(citing Ex. 1002, 5:15–38; Ex. 1027, 1:56–67).  That those same references

20

Capella_Infinera_000051427

IPR2015-00726
Patent RE42,368 E

were not cited in an article by Dr. Ford in 2006 is of little relevance to our
determination of obviousness in this proceeding.

Next, Patent Owner argues that one of Petitioner's motivations for
combining Bouevitch with Carr comes from the '368 patent because
(1) Petitioner contends dual axis mirrors compensate for system alignment
errors from well-known problems like imperfect assembly or temperature
changes, (2) Petitioner and Dr. Ford provide no citation that such problems
were "well-known," and (3) the '368 patent states certain prior art provided
"no mechanisms implemented for overcoming degradation in the alignment
owing to environmental effects such as thermal and mechanical disturbances
over the course of operation." PO Resp. 35.  We find persuasive Petitioner's
reply that Bouevitch and Carr, rather than the '368 patent, sufficiently
provide the motivation for the asserted combination.  *See* Pet. Reply 16
(describing a "*two-axis MEMS device with 'highly accurate lateral
alignment*' that 'permits precise control of the mirrors, a more robust
structure, greater packing density, larger mirror sizes, and larger mirror
rotation angles than are conventionally obtained and easier electrical
connection to the mirrors'" (quoting Ex. 1005, 4:9–17 (emphasis added))
and discussing "alignment problems" and concerns with "small temperature
fluctuations" (quoting Ex. 1002, 10:9–10, 64–65)).

Finally, Patent Owner argues that Petitioner's motivations to combine
"drastically over simplify the subject matter of the claimed inventions" and
no ordinary skilled person would combine Bouevitch and Carr because it
"would have injected complexity into Bouevitch's system without any added
functionality." PO Resp. 36.  We find Patent Owner's argument conclusory

21

Capella_Infinera_000051428

IPR2015-00726
Patent RE42,368 E

and not persuasive because it fails to address the benefits of a two-axis mirror disclosed by Carr which would be apparent to one of skill in the art without hindsight.  We also find persuasive Petitioner's contention that it would have been obvious to try, because, as Dr. Ford testified: (1) there were only two solutions to the known need to deflect light beams with MEMS: 1-axis or 2-axis; (2) a person of ordinary skill would have had a high expectation of success to try two-axis mirror control in Bouevitch; and (3) the result of the combination would be predictable.  *See* Pet. 27–28; Pet. Reply 12; Ex. 1037 ¶ 144.  Although Dr. Sergienko states that a person of ordinary skill "would have considered many factors" before substituting a two-axis mirror for a one-axis mirror, the references of record reflect that there are routinely complex design considerations in the fiber optic communications field.  Ex. 2033 ¶ 142.  Patent Owner does not explain persuasively why combining the teachings of Bouevitch and Carr would be beyond the skill of a skilled artisan, even if feats of engineering are contemplated.

Petitioner has articulated sufficiently reasoning with some rational underpinning to support the legal conclusion of obviousness based on the asserted combination of Bouevitch and Carr.  With regard to incorporating the teaching of a two-axis mirror in Carr with Bouevitch, we are persuaded that it is a simple substitution, notwithstanding the fact that it may require substantial engineering as a practical matter.  Further, the asserted combination of Bouevitch and Carr yields a predictable result.  *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable

22

IPR2015-00726
Patent RE42,368 E

results.").  For the foregoing reasons, Petitioner has established by a
preponderance of the evidence that claim 1 would have been obvious over
Bouevitch and Carr.[7]

> 2.      Claims 2, 5, 6, 9–12, and 15–21

In addition to addressing the elements of claim 1, we agree with
Petitioner's identification of how claims 2, 5, 6, 9–12, and 15–21 would
have been obvious over Bouevitch and Carr, as supported by the declaration
of Dr. Ford.  Pet. 36–47; Ex. 1037 ¶151.  Patent Owner has not raised
additional arguments with respect to claims 2, 5, 6, 9–12, and 15–21 beyond
those asserted with respect to claim 1, addressed above.  We have assessed
the information provided and determine that Petitioner has established by a
preponderance of the evidence that claims 2, 5, 6, 9–12, and 15–21 would
have been obvious over Bouevitch and Carr.

> D.      Asserted Obviousness Over Bouevitch and Sparks

Petitioner contends claims 1–4, 17, and 22 would have been obvious
over Bouevitch and Sparks.  Pet. 47–57.  Petitioner provides a claim chart
describing how Bouevitch and Sparks discloses each of the limitations of the
claims.  *Id.* at 51–57.  Petitioner's contentions are supported by Dr. Ford.
Ex. 1037 ¶ 155–164.  In summary, Petitioner relies on Bouevitch as
disclosing the same features Petitioner contends Bouevitch discloses in the
combination with Carr, as discussed above.  Petitioner further relies on
Sparks as disclosing a MEMS array with elements individually and
continuously controllable in two dimensions to reflect channels and control

---

[7] Patent Owner provides no persuasive evidence of secondary considerations
to support the patentability of claims of the '368 patent.

23

Capella_Infinera_000051430

IPR2015-00726
Patent RE42,368 E

power, as claimed.  *See* Pet. at 47, 53; *see also* Ex. 1006, 4:43–45
(describing an optical switch comprising arrays of MEMS capable of two
axis movement).  Specifically, Sparks discloses using movable micromirrors
capable of two axes movement so that "each of the channels passing through
the switch may be attenuated to whatever degree necessary to achieve the
desired effect." Ex. 1006, 2:30–35, 4:39–47.

Petitioner has shown, as discussed above and as supported by
Dr. Ford, that Bouevitch discloses the input, output, and one or more other
ports, as recited by claim 1.  Patent Owner does not dispute Petitioner's
contention that Sparks and Bouevitch together disclose the remaining
limitations of claims 1–4, 17, and 22.  Petitioner also has demonstrated that
the rationale for the asserted combination of Bouevitch and Carr similarly
applies to the combination of Bouevitch and Sparks.  For example, Petitioner
contends that a person of ordinary skill "would have been motivated to
combine the two axis movable MEMS mirrors of Sparks in the COADM of
Bouevitch based on the teachings of the references, common sense and
knowledge generally available to a [person of ordinary skill], as the
proposed combination would merely be substituting known elements to yield
predictable results," and that "using the known two-axis mirrors of Sparks in
the Bouevitch COADM entails nothing more than the use of known
techniques to improve similar devices."  Pet. 48–49.

Patent Owner disputes the sufficiency of the rationale provided in the
Petition for the combination of Bouevitch and Sparks on the same bases
Patent Owner argued with respect to the combination with Carr discussed
above.  PO Resp. 23–36 (arguing that Petitioner's "proposed combinations

24

Capella_Infinera_000051431

IPR2015-00726
Patent RE42,368 E

(1) conflict with Bouevitch's principle of operation and (2) are based on nothing but impermissible hindsight," and "[a]s such, a [person of ordinary skill] would have had no reason to combine Bouevitch with either Carr or Sparks."). For the reasons explained above, we are not persuaded by Patent Owner's assertion that the "*intentional* misalignment techniques taught by Carr and Sparks conflict with Bouevitch's optical design." *Id.* at 28. Nor are we persuaded that the motivation to combine Bouevitch and Sparks comes from the '368 patent and amounts to impermissible hindsight. *See* PO Resp. 31–36. As noted above, Bouevitch discusses "alignment problems" and concerns with "small temperature fluctuations." Ex. 1002, 10:9–10, 64–65. Petitioner notes that Sparks also explains that the disclosed two-axis MEMS mirrors are fabricated to "*carefully align the beams* so as to ensure that the maximum possible input optical signal is received at the output of the switch" if desired. Pet. Reply 16 (quoting Ex. 1006, 4:42–47 (emphasis added)).

Petitioner has articulated sufficient reasoning with some rational underpinning to support the legal conclusion of obviousness based on the asserted combination of Bouevitch and Sparks. With regard to incorporating the teaching of a two-axis mirror in Sparks with Bouevitch, we are persuaded that it is a simple substitution, notwithstanding the fact that it may require substantial engineering as a practical matter. Further, the asserted combination of Bouevitch and Sparks yields a predictable result. *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). For the foregoing reasons, Petitioner has established by a

25

IPR2015-00726
Patent RE42,368 E

preponderance of the evidence that claims 2, 5, 6, 9–12, and 15–21 would
have been obvious over Bouevitch and Sparks.

### E.   Conclusion

Petitioner has shown by a preponderance of the evidence that claims
1, 2, 5, 6, 9–12, and 15–21 would have been obvious over Bouevitch and
Carr, and that claims 1–4, 17, and 22 would have been obvious over
Bouevitch and Sparks.

## IV.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, based on a preponderance of the evidence, claims 1–
6, 9–12, and 15–22 of U.S. Patent No. RE42,368 are unpatentable; and,

FURTHER ORDERED that, because this is a Final Written Decision,
the parties to the proceeding seeking judicial review of the decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

Capella_Infinera_000051433

IPR2015-00726
Patent RE42,368 E

For PETITIONER:

Nathaniel T. Browand
Mark Scarsi
Christopher Gaspar
Christopher E. Chalsen
Lawrence T. Kass
Suraj K. Balusa
MILBANK, TWEED, HADLEY & MCCLOY LLP
nbrowand@milbank.com
mscarsi@milbank.com
cgaspar@milbank.com
cchalsen@milbank.com
lkass@milbank.com
sbalusu@milbank.com

Matthew J. Moore
Robert Steinberg
LATHAM & WATKINS LLP
matthew.moore@lw.com
bob.steinberg@lw.com

J. Pieter van Es
Thomas K. Pratt
Jordan N. Bodner
Michael S. Cuviello
BANNER & WITCOFF, LTD.
PvanEs@bannerwitcoff.com
TPratt@bannerwitcoff.com
JBodner@bannerwitcoff.com
MCuviello@bannerwitcoff.com

27

IPR2015-00726
Patent RE42,368 E

For PATENT OWNER:

Jason D. Eisenberg
Robert Greene Sterne
Jon E. Wright
Jonathan Tuminaro
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
jasone-PTAB@skgf.com
rsterne-PTAB@skgf.com
jwright-PTAB@skgf.com
jtuminar-PTAB@skgf.com

28

Capella_Infinera_000051435