**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| CAPELLA PHOTONICS, INC.,<br><br>                      Plaintiff<br><br>     v.<br><br>INFINERA CORPORATION, TELLABS, INC., TELLABS OPERATIONS INC., CORIANT AMERICA INC., and CORIANT (USA) INC.,<br><br>                    Defendants. | Civ. No. 2:20-cv-00077<br><br>██████████████ |

**DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE THE DAMAGES-RELATED
OPINIONS OFFERED BY DAVID TEECE AND WAYNE KNOX**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  FACTUAL AND PROCEDURAL BACKGROUND......................................................... 1

    A.  Dr. Teece's Cost Analysis of Infinera's Alleged "Maximum Willingness to Pay." ... 1

    B.  Dr. Teece's Analysis of Capella's Alleged "Minimum Willingness to Accept." ....... 3

    C.  Dr. Teece Applies His Royalty Rate to Two Alternative Damages Bases. ................. 4

II. ARGUMENTS AND AUTHORITIES .............................................................................. 5

    A.  The Yield Approach is Arbitrary and Unreliable and Should be Excluded. .............. 5

    B.  The Prior Art Approach is Unreliable and Should be Excluded. ............................... 8

    C.  Dr. Teece Fails to Opine the FEC Agreement is Comparable................................... 11

    D.  Dr. Teece's Second Alternative Damages Base Should be Excluded. ...................... 13

III. CONCLUSION............................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Biscotti Inc. v. Microsoft Corp.*,
    2:13-cv-1015-JRG-RSP, 2017 WL 2607882 (E.D. Tex. May 25, 2017) ........................11, 13

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..................................................................................................1, 5, 11

*Enplas Display Device Corp. v. Seoul Semiconductor Co*,
    909 F.3d 398 (Fed. Cir. 2018)................................................................................................14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)................................................................................................11

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).......................................................................................11, 13

*PharmaStem Therapeutics, Inc. v. Viacell*,
    491 F.3d 1342 (Fed. Cir. 2007)...............................................................................................9

*Power Integrations v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013)..........................................................................6, 7, 9, 10, 11

*Stragent, LLC v. Intel Corp.*,
    6:11-cv-421-TBD, 2014 WL 1389304 (E.D. Tex. Mar. 6, 2014).......................................5, 15

*Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*,
    2:17-cv-651-JRG, 2019 WL 2267212 (E.D. Tex. May 28, 2019).........................................13

*Uniloc USA v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011).......................................................................................5, 8, 15

*Utah Med. Prods. v. Graphic Controls Corp.*,
    350 F.3d 1376 (Fed. Cir. 2003)..............................................................................................13

*VirnetX v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)..........................................................................................5, 15

STATUTES

35 U.S.C. § 252................................................................................................................15

35 U.S.C. § 271................................................................................................................14

**OTHER AUTHORITIES**

Fed. R. of Civ. Proc. 26 ...................................................................................................1

Fed. R. of Evid. 702 .......................................................................................................1

Fed. R. of Evid. 703 .......................................................................................................1

Infinera moves to exclude certain damages-related opinions of Capella's damages expert, Dr. David Teece, and Capella's infringement expert, Dr. Wayne Knox, pursuant to Fed. R. of Evid. 702 and 703, Fed. R. of Civ. Proc. 26, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) because they are unreliable and turn on arbitrary assumptions divorced from the facts of this case.   Conceding as much, Dr. Teece and Dr. Knox cast certain analyses as mere "placeholders."   But Rule 26(a)(2)(B) does not permit "placeholder" analyses in expert reports, and Capella's unjustified attempt to sponsor "placeholder" opinions flaunts the Court's deadlines and frustrates Rule 26's notice function.   Relying on arbitrary "placeholders" renders Dr. Knox and Dr. Teece's opinions fatally flawed and unable to withstand *Daubert* scrutiny.

Infinera moves to exclude four fundamentally flawed opinions.   First, Dr. Knox and Dr. Teece's yield approach arbitrarily assumes 3% yield as a "placeholder" that both experts acknowledge lacks support.   Second, Dr. Knox and Dr. Teece's prior art approach rests on unreliable data and flawed assumptions, and Dr. Teece ultimately rejects it.   Third, Dr. Teece applies a royalty rate from an "FEC Agreement" that he refuses to opine is comparable.   Finally, Dr. Teece applies a second alternative damages base that improperly relies on purchases and pre-issuance activity, which violates the Court's Report and Recommendation limiting Capella to post-issuance damages, and arbitrarily assumes an inventory "placeholder" that lacks factual basis.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Capella's damages expert Dr. Teece calculates a reasonable royalty rate per WSS by analyzing (1) Infinera's alleged "maximum willingness to pay," and (2) Capella's alleged "minimum willingness to accept."  Ex. A, Teece Rep. ¶¶ 473-475 & Ex. 2.

### A.  Dr. Teece's Cost Analysis of Infinera's Alleged "Maximum Willingness to Pay."

For Infinera's maximum willingness to pay, Dr. Teece attempts to determine Infinera's alleged cost savings from the patented invention compared to "the best available alternatives."  *Id.*

¶ 163.  Dr. Teece's cost analysis contains two alternative approaches: a yield approach and a prior art approach.  *Id*. ¶¶ 164-171 & Ex. 3.  For the per-unit amounts calculated for both approaches, Dr. Teece relies on the technical opinions of Dr. Knox.  *Id*. ¶¶ 163-171; Ex. C, Knox Rep. ¶¶ 101-111.  Dr. Teece ultimately selects only the cost from the yield approach in his reasonable royalty calculations.  Ex. A, Teece Rep., Exs. 2-3; Ex. B, Teece Dep. at 69:2-7.

### i.   Dr. Knox and Dr. Teece's Yield Approach to Cost Savings.

For the yield approach, Dr. Knox attempts to analyze the alleged invention's impact on manufacturing yield achieved by the accused components, wavelength selective switches (WSSs), based on a series of assumptions.  First, Dr. Knox assumes that the accused WSSs lose 3-5% in manufacturing yield.  Ex. C, Knox Rep. ¶ 106.  Dr. Knox then assumes that without the alleged invention, the WSSs' yield losses increase exponentially with the number of channels.  *Id*. ¶ 107.  Relying on both assumptions, Dr. Knox selects a 3% yield loss and creates the following equation:

$$\text{Yield without Asserted Claims} = (1.00 - 0.03)^{(\text{Number of Channels})}$$

*Id*.; *see also id*. ¶¶ 110-111 (applying this analysis to both fixed channel and variable channel WSSs).  Dr. Knox cites no evidence to support the 3% yield loss that he uses to calculate the alleged invention's impact on yield, referring to 3% as a "placeholder" "until we could [see] the real[] data."  Ex. D, Knox Rough Dep. at 150:22-23; *see also id.* at 147:19-148:4.

Dr. Teece exclusively relies on Dr. Knox's analysis to assume that, without using the alleged invention, the accused WSSs allegedly would experience yields ranging ███████, with different yield floors depending on the WSS.  Ex. A, Teece Rep., ¶ 164 & Exs. 6.b-c. Based on this assumption, Dr. Teece then calculates the alleged cost of not using the alleged invention.  *Id*. Ex. 6.a.  Dr. Teece uses this cost as Infinera's alleged "maximum willingness to pay" for his reasonable royalty calculation.  *Id*. Exs. 2-3.

### ii. Dr. Knox and Dr. Teece's Prior Art Approach to Cost Savings.

For the prior art approach, in a three-paragraph analysis, Dr. Knox attempts to compare the alleged cost savings of the invention to prior art.  Ex. C, Knox Rep. ¶¶ 102-104.  To do so, Dr. Knox assumes that a single slide from a 2001 Capella Board presentation is an "████████ ████████████████████" to the alleged invention.  *Id.* ¶ 102.  From that ***2001*** Board presentation, Dr. Knox uses Capella's ████████████████████████████ ████████████████████████████  *Id.* ¶¶ 102-103.[1]  Comparing these cost estimates, Dr. Knox concludes that the Asserted Patent achieves an ████ cost savings.  *Id.* ¶ 104.

Dr. Teece exclusively relies on Dr. Knox's cost-savings estimates and the 2001 Capella Board presentation to calculate the alleged "cost impact of avoided asserted claims."  Ex. A, Teece Rep., ¶¶ 167-169 & Ex. 7.  Dr. Teece assumes the parties would consider these 2001 cost savings at the hypothetical negotiation in 2020.  *Id.* ¶ 170.  Dr. Teece ultimately does not use the cost from the prior art approach to calculate a reasonable royalty rate, testifying instead that he ultimately rejects the approach despite including it in his report. *See id.* Exs. 2-3; Ex. B, Teece Dep. at 69:2-7 (testifying "I basically reject [the prior art approach] as not being the right benchmark.").

### B. Dr. Teece's Analysis of Capella's Alleged "Minimum Willingness to Accept."

For Capella's minimum willingness to accept, Dr. Teece relies on Furukawa Electric Co. ("FEC") and Capella's first License and Technical Assistance Agreement dated September 1, 2006 ("FEC Agreement") ████████████.  Ex. A, Teece Rep. ¶¶ 441-442, 473 & Ex. 4.  Dr. Teece opines that the FEC Agreement is "████████████████████████████████████ ██████," but does not opine that the FEC Agreement is a comparable license.  *Id.* ¶ 224.  Dr. Teece repeatedly testified that he does not rely on the FEC Agreement as a comparable license.

---

[1] All emphasis is added unless otherwise indicated.

*See* Ex. B, Teece Dep. at 49:8-18 (testifying "I'm not using [the FEC Agreement] as a comparable license."); *id*. at 49:19-21 ("Q. So it's not your opinion that the FEC license is comparable? A. I'm not using it in that fashion. . . ."); *id*. at 155:11-23 (testifying "It's not, quote, being used as a – what you'd legally think of as a comparable license."); *see also id.* at 48:8-52:18.

Dr. Teece relies on the FEC Agreement in *Georgia Pacific* Factors 1 and 15.  Ex. A, Teece Rep., ¶¶ 226, 402-403, 421, 441-442.[2]  Dr. Teece applies the agreement's ███████████ to determine Capella's alleged "minimum willingness to accept" at the hypothetical negotiation. *Id.* Ex. 4; Ex. B, Teece Dep. at 69:9-25, 154:21-25 ("Q. And I think you testified earlier today that the ████████████ that you apply in your damages calculation is based on an agreement between Furukawa and Capella from 2006; is that right? A. That is correct.").

### C.  Dr. Teece Applies His Royalty Rate to Two Alternative Damages Bases.

Using Infinera's alleged "maximum willingness to pay" based on the yield approach to cost-savings and Capella's alleged "minimum willingness to accept" based on the royalty rate from the FEC Agreement, Dr. Teece calculates a reasonable royalty rate per WSS unit.  Ex. A, Teece Rep. ¶¶ 473-475 & Ex. 2; Ex. B, Teece Dep. at 157:2-9.  Dr. Teece applies his royalty rate to two alternative damages bases.  Ex. A, Teece Rep., Ex. 1.  The first damages base uses Infinera's sales of accused ROADM modules.  *Id*. Ex. 1, Row [B] & Ex. 10.a, Row [N].  The second and alternative damages base uses Infinera's purchases of accused WSS components from its suppliers.  *Id*. Ex. 1, Row [C] & Ex. 8.a, Row [C].

Dr. Teece's second and alternative damages base (based on Infinera's purchases of accused WSS components) includes purchases from Q4 2020 and Q1 2021, before the Asserted Patent

---

[2] At deposition, Dr. Teece testified that he does not rely on the FEC Agreement for *Georgia-Pacific* Factor 1, but that testimony is incorrect.  *Compare* Ex. B, Teece Dep., at 52:7-16 *with* Ex. A, Teece Rep. ¶¶ 402-403.

issued.  *Id*. Ex. 8.a, Columns [5] and [6]; Ex. B, Teece Dep. at 92:11-93:9.  In including these pre-issuance purchases, Dr. Teece "[a]ssumes 6-months in inventory from the time the WSS part is purchased to the time the Accused Product is made, sold, offered for sale, or exported."  Ex. A, Teece Rep., Ex. 8.a n.13.  Dr. Teece admits that he cites no evidence for his inventory assumption, referring to it as a "placeholder."  Ex. B, Teece Dep. at 93:10-94:6, 94:21-96:6, 97:16-98:2.

## II.   ARGUMENTS AND AUTHORITIES

### A.  The Yield Approach is Arbitrary and Unreliable and Should be Excluded.

Dr. Knox's yield analysis relies on multiple layers of arbitrary assumptions that lack basis in fact.  The *Daubert* inquiry considers whether expert testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (internal quotations omitted).  An expert's opinion is properly excluded if it relies on "arbitrary assumptions that have no basis in the facts of [the] case."  *Stragent, LLC v. Intel Corp*., 6:11-cv-421-TBD, 2014 WL 1389304, at *4 (E.D. Tex. Mar. 6, 2014)  (Dyk, J., sitting by designation), *order clarified* 2014 WL 12611339 (E.D. Tex. Mar. 12, 2014).  On this basis, the Federal Circuit has rejected various arbitrary theories such as the 25% rule of thumb and the Nash Bargaining solution.  *See, e.g*., *VirnetX, Inc. v. Cisco Sys., Inc*., 767 F.3d 1308, 1331-34 (Fed. Cir. 2014) (rejecting Nash Bargaining solution as "insufficiently tied to the facts of the case" and unsound);  *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1319 (Fed. Cir. 2011) (finding 25% rule of thumb bore "no relation to the facts of the case, and as such, was arbitrary, unreliable, and irrelevant").

First, Dr. Knox arbitrarily assumes, admittedly without any basis in the facts of this case, that the accused WSS devices achieve manufacturing yield losses between 3-5%.  Ex. C, Knox Rep. ¶ 106.  Dr. Knox then uses the 3% yield to calculate the alleged yield losses of noninfringing WSSs based on an exponential formula that assumes—again without any basis in the facts of the case—that yield issues compound exponentially based on the number of channels.  *Id*. ¶ 107.  Dr.

Knox's "layered assumptions lack the hallmarks of genuinely useful expert testimony." *See, e.g.*,

*Power Integrations v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1374 (Fed. Cir. 2013).

### i.   Dr. Knox arbitrarily assumes 3% yield as an improper "placeholder."

Dr. Knox's 3% yield assumption is arbitrary and unverifiable without any grounding in the

facts of this case.   Dr. Knox referred to his 3% yield assumption as a mere "placeholder,"

acknowledging it has no basis in fact or data:

> Q. Are you aware of any facts that support 3% being an accurate
> figure for the yield increased per channel with the asserted claims?
> A. I – As I mentioned I requested that information. I didn't get it so
> – so we went with this assumption.  Yes.  It's – it's – it's essentially
> should be thought [] of [as] a ***placeholder***.  Because I thought – I
> thought I was going to get the yield information.  But the clock ran
> out they did not provide that information.

Ex. D, Knox Rough Dep. at 147:19-148:4; *id.* at 150:22-23 ("This was a – really a ***placeholder***

until we could [see] the real[] data. . . ."). Dr. Knox did not, and could not, vouch for its accuracy.

*Id.* at 146:2-6, 147:1-7, 151:6-12.

While Dr. Teece relies on Dr. Knox for the yield calculations, when directly asked, Dr.

Knox did not know who came up with the arbitrary 3%, testifying it came from "discussions" with

"damages people."  *Id.* at 145:19-21 ("Q. Where does this conservative 3% figure come from? A.

Yeah, it's from – from discussions with our damages people. . . ."); *id.* at 147:12-13 ("Q. Did you

come up with the 3% number? A. Well, it was a discussion.").  These "discussions" with "damages

people" could not have included Dr. Teece, because Dr. Knox never spoke to—and in fact had

never ever heard of—Dr. Teece.  *Id.* at 23:24-25 ("Have you ever spoken to a Mr. Teece before?

A. No."); *id.* at 24:4-5 ("Q. Do you know who Mr. Teece is? A. I – I don't know who he is.").

Dr. Knox's testimony that the 3% yield figure came from "discussions" with "damages

people" at best refers to Dr. Teece's assistants, John Blair and Kelly Nordby.  *See id.* at 27:20-

28:16; Ex. B, Teece Dep. at 13:9-21.  Neither Mr. Blair nor Dr. Nordby submitted expert reports

in this case, nor has Capella established that either of them qualify as experts, particularly in the technical field of WSS manufacturing yield.  The arbitrary 3% yield figure underpinning Dr. Knox's yield calculations, and in turn Dr. Teece's yield analysis, thus appears to be the invention of undisclosed individuals without established expertise in technical subject matter.  *See id*. "[S]uch unreliable testimony frustrates a primary goal of expert testimony in any case, which is meant to place experience from professional specialization at the jury's disposal, not muddle the jury's fact-finding with unreliability and speculation."  *See Power Integrations*, 711 F.3d at 1374.

### ii.  Dr. Knox's Arbitrary Yield Assumptions Cannot be Cured.

Acknowledging the arbitrary 3% yield figure is not rooted in any actual evidence in this case, Dr. Knox testified that he requested actual yield evidence, but never received any.  *See* Ex. D, Knox Rough Dep. at 147:19-148:4, 151:6-12 ("Q. Because sitting here today, you can't say whether 3% is accurate or inaccurate as . . . reflecting the [yield] advantage by using the asserted claims; correct? Q. Again I . . . requested the information for that but did not receive it.").  Infinera is unaware of Capella requesting WSS yield information in this case.[3]  As Dr. Knox recognizes, WSS yield information would reside, if at all, with Infinera's WSS suppliers. *See* Ex. D, Knox Rough Dep. at 143:7-11.  Infinera is unaware of Capella requesting yield information from its suppliers in this case,[4] but even if Capella did, Capella never moved to compel this information. The fact discovery and motion to compel deadlines have passed.  Thus, despite Dr. Knox's attempt

---

[3] Capella served over 80 document requests and 49 interrogatories to Infinera, and the word "yield" does not appear in any of them.  *See* Exs. F-M. Moreover, Infinera attempted to discern Capella's damages theories through an interrogatory, but Capella never substantively responded, let alone responded  in a manner that put Infinera on notice that Capella considered WSS yield relevant to damages in this case.  *See* Ex. N, Capella's 11/9/20 Resp. to Rog. No. 4, at 8-9.

[4] Capella subpoenaed Infinera's suppliers, but nowhere in those subpoenas did Capella request information about WSS yield—again, the word "yield" does not appear in the subpoenas.  *See* Exs. O-R. Capella also had the opportunity to depose four witnesses from three of Infinera's suppliers, and only asked one witness from one supplier any questions about yield.

to rely on an arbitrary 3% yield figure as a mere "placeholder" until reliable evidence is available, there is no basis to contend that reliable yield information is forthcoming in this case.  An opportunity to supplement, to the extent requested by Capella, therefore cannot resurrect Dr. Knox's flawed yield analysis.  Because Dr. Knox's yield theory rests on arbitrary assumptions not tied to the facts of this case, it should be precluded.

### iii.  Dr. Teece's Yield Impact Cost Analysis Relies on Dr. Knox's Arbitrary Yield Analysis and Should Also be Precluded.

Dr. Teece's yield analysis relies entirely on Dr. Knox for its technical assumptions, which include (1) the accused WSSs suffer 3% manufacturing yield losses; and (2) without the alleged invention, the accused WSSs' yield issues would increase exponentially with the number of channels according to Dr. Knox's equation. Ex. A, Teece Rep. ¶¶ 161, 164 & Ex. 6.b.  Dr. Teece does not independently opine or analyze the yield theory's technical underpinnings.  *See id.*; Ex. B, Teece Dep. 68:4-15, 107:21-110:16, 111:6-13, 111:14-112:12.  Thus the flaws in Dr. Knox's analysis irreparably taint Dr. Teece's yield-impact cost analysis, and the Court should preclude Dr. Teece's yield-impact cost analysis for the same reasons.  *See Uniloc*, 632 F.3d at 1317 ("Beginning from a fundamentally flawed premise . . . results in a fundamentally flawed conclusion.").

### B.  The Prior Art Approach is Unreliable and Should be Excluded.

As an alternative to the yield approach, Dr. Knox and Dr. Teece rely on a prior art approach to attempt to evaluate the cost of avoiding infringement.  Ex. C, Knox Rep. ¶¶ 102-104; Ex. A, Teece Rep. ¶¶ 167-170.  But the prior art approach is grounded in unreliable information and flawed assumptions, is unhelpful to the jury, and should be excluded.

### i.  Dr. Knox and Dr. Teece Rely Solely on an Unreliable Source.

The sole basis of the prior art approach—a single slide of a 2001 Capella Board presentation—is manifestly unreliable for several reasons.  *See* Ex. C, Knox Rep. ¶¶ 102-104.

8

First, Dr. Knox relies on unreliable cost "estimates" as actual cost information.  *Id*. ¶ 102.  The

2001 presentation pre-dates any Capella commercial product by several years, rendering the

alleged costs for ██████████████ at best projections.  Ex. A, Teece Rep., ¶ 276.  Dr. Knox

was unable to verify that the component cost "estimates" are accurate.  Ex. D, Knox Rough Dep.

58:4-10, 59:15-18.  Dr. Knox had no information or evidence regarding what these components

actually cost in 2001.  *See, e.g.*, *id*. at 58:4-10.

Second, neither Dr. Knox nor the 2001 Board presentation on its face attributes the

underlying cost estimates to an identifiable source.  *See* Ex. C, Knox Rep. ¶¶ 102-104.  In

particular, Dr. Knox does not know how ████████████████ were derived.  As far as he

knows, they could have been cut-and-paste from some unidentified source, pulled from an

unknown corner of the Internet, or simply conjured from thin air:

> Q. So my question was simply: Sir do you know whether this thing
> that you cut and paste into your report was actually cut and pasted
> originally from some third party?
> A. So [] I have no way of knowing that.

Ex. D, Knox Rough Dep. at 57:24-58:3; *see also id.* at 59:5-18 (acknowledging he does not know

who prepared the presentation or whether that person made up the cost estimates out of thin air,

but assumes that did not happen).  Where, as here, the source of an expert's information is unclear,

the information is "derived from a manifestly unreliable source," and the expert's analysis should

be excluded.  *See Power Integrations*, 711 F.3d at 1373.

Third, the 2001 Board presentation's ████████████████████████

████████████████ are directed to investors, and designed to recruit financial support for

Capella. Ex. C, Knox Rep. ¶¶ 102; Ex. D, Knox Rough Dep. at 119:16-19.  As the Federal Circuit

recognizes, expert testimony based on investor materials is unhelpful to the jury and properly

excluded.  *See PharmaStem Therapeutics, Inc. v. Viacell*, 491 F.3d 1342, 1354-55 (Fed. Cir. 2007)

(expert testimony "almost entirely based on an interpretation of the defendants' marketing materials and materials directed to investors," rendered the expert's expertise "of no apparent help to the jury").  For this reason alone, the prior art approach is inappropriate for jury consideration.

### ii.   Dr. Knox and Dr. Teece Rely on Flawed and Unsupported Assumptions.

Beyond the unreliability of the underlying data, Dr. Knox and Dr. Teece each rely on flawed assumptions.   First, Dr. Knox assumes the 2001 Board presentation is "█████████ ███████████████████" without considering any actual prior art.  *See* Ex. C, Knox Rep. ¶ 102; Ex. D, Knox Rough Dep. at 26:20-22 (failing to consider Infinera's invalidity report); 46:10-22 (failing to substantively review the Asserted Patent's file history); 47:17-21 (failing to review the final written decisions).  Dr. Knox's "prior art" analysis fails to evaluate the cost of any actual prior art produced in this case, relying instead on ████████████████████ without analyzing whether those systems even qualify as prior art.  Dr. Knox's analysis lacks rigor, and is unreliable and unhelpful to the jury.  *See Power Integrations*, 711 F.3d at 1374.

Second, Dr. Teece assumes, without analysis, that the 2001 cost savings reflect the cost savings at a hypothetical negotiation in 2020.  Ex. A, Teece Rep. ¶ 170.  Dr. Knox and Dr. Teece fail to evaluate cost differences between 2001 and 2020, or explain why, at a hypothetical negotiation, Infinera would be limited to the costs of 20-year old alternatives from 2001.  As Dr. Knox admits, prices change over time.  Ex. D, Knox Rough Dep. at 59:21-60:11 (testifying "all of these components have very – very – very time-dependent costs associated with them," and "basically all optical and networking components, [] change in price over time . . . .").  Yet Dr. Knox did not analyze any 2020 costs.  *Id.* at 59:21-60:11, 61:2-13, 62:18-20 ("Q. In fact, [you] don't have any information on any of the elements picked here would cost in 2020, correct? A. That's correct.").  Using 2001 cost estimates as a proxy for cost-savings at a hypothetical negotiation in 2020 renders the prior art approach speculative and unreliable.

### iii.  Dr. Teece Rejects the Prior Art Approach.

Dr. Teece does not ultimately rely on the prior art approach in calculating a reasonable royalty.  *See* Ex. A, Teece Rep. Exs. 2, Row [A] (relying on the yield impact, not the prior art approach) & Ex. 3.  Rather, Dr. Teece *rejects* the prior art approach in his analysis:

> Q. Any other alternate maximum willingness to pay that we haven't talked about that you're intending to rely on?
> A. No.  I think Exhibit 3 shows ***the prior art approach***, the cost impact, but I basically ***reject*** that as not being the right benchmark.

Ex. B, Teece Dep. at 69:2-7.  Dr. Teece should not be permitted to testify about approaches that he ultimately rejects.  Such testimony does not aid the jury in resolving damages.  *See Daubert*, 509 U.S. at 591 (testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute").  Because Dr. Knox's prior art analysis is only relevant to support Dr. Teece's analysis, excluding one warrants excluding the other to avoid muddling the jury's fact-finding with extraneous and irrelevant analyses.  *See* Ex. A, Teece Rep. ¶¶ 167-171 & Ex. 7 (relying on Dr. Knox); *see Daubert*, 509 U.S. at 591; *Power Integrations*, 711 F.3d at 1374.

### C.  Dr. Teece Fails to Opine the FEC Agreement is Comparable.

The patentee bears the "burden to prove that the licenses [relied on] [are] sufficiently comparable" to a hypothetical license.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009).  Otherwise, a "plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).  "[W]hen relying on past licenses to support an opinion regarding a reasonable royalty . . . a damages expert must opine on both the technological and economic comparability of such past licenses."  *Biscotti Inc. v. Microsoft Corp.*, 2:13-cv-1015-JRG-RSP, 2017 WL 2607882, at *3

(E.D. Tex. May 25, 2017).  Because Dr. Teece fails to opine that the FEC Agreement is technically and economically comparable, his reliance on the FEC Agreement must be excluded.

Dr. Teece fails to opine that the FEC Agreement is comparable to a hypothetical license. Dr. Teece at most states that the FEC Agreement is "████████████████████████████████████ ████████████████████" but absent from his report is any opinion on comparability.  Ex. A, Teece Rep. ¶ 224.  Dr. Teece did not identify where he opined on comparability when directly asked.  *See* Ex. B, Teece Dep., at 155:5-23.  Rather, Dr. Teece repeatedly testified that he does *not* rely on the FEC Agreement as a comparable license.  *Id*. at 49:8-18 (testifying "I'm not using [the FEC Agreement] as a comparable license."); *id*. at 49:19-21 ("Q. So it's not your opinion that the FEC license is comparable? A. I'm not using it in that fashion."); *id*. at 155:11-23 (testifying "It's not, quote, being used as a – what you'd legally think of as a comparable license.").

First, Dr. Teece fails to opine that the FEC Agreement is economically comparable to a hypothetical license, nor can he.  *See* Ex. A, Teece Rep. ¶ 224; Ex. B, Teece Dep. at 49:8-52:16, 155:5-23.  The FEC Agreement involved ████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████  Dr. Teece also fails to opine that the FEC Agreement resulted from an arms-length negotiation, particularly in light of its collaborative

nature.  *See* Ex. A, Teece Rep. ¶¶ 206-219.   Accordingly, Dr. Teece fails to establish the economic

comparability required to rely on the FEC Agreement.  *See, e.g.*, *Lucent Techs*., 580 F.3d at 1329.

Second, Dr. Teece fails to opine that the FEC Agreement is technically comparable.  The

FEC Agreement does not ███████████████████████████████████ and neither Dr.

Teece nor Dr. Knox opine that the licensed patents are technically comparable to the Asserted

Patent.  A "patentee may not rely on licenses for which," as here, "there is a complete absence of

evidence showing a link to the claimed technology."  *Uniloc USA, Inc. v. Samsung Elecs. Am.,*

*Inc.*, 2:17-cv-651-JRG, 2019 WL 2267212, at *12 (E.D. Tex. May 28, 2019).

Despite failing to opine that the FEC Agreement is comparable, Dr. Teece exclusively

relies on the FEC Agreement to derive ████████████, which he applies to calculate a

reasonable royalty.  Ex. A, Teece Rep. ¶¶ 224-226, 402-403, 441-442 & Exs. 2, 4; Ex. B, Teece

Dep. at 69:9-25, 154:21-25, 157:2-9.  Failure to establish an agreement's comparability goes to

admissibility, not weight.  *See, e.g.*, *Lucent Techs.*, 580 F.3d at 1329; *Utah Med. Prods.  v. Graphic*

*Controls Corp.*, 350 F.3d 1376, 1385-86 (Fed. Cir. 2003) (excluding testimony where expert failed

to show comparability); *Biscotti*, 2017 WL 2607882, at *3 (similar).   Without establishing

comparability, Dr. Teece's reliance on the FEC Agreement is unreliable and should be excluded.

### D.  Dr. Teece's Second Alternative Damages Base Should be Excluded.

Dr. Teece applies his royalty rate to two alternative damages bases, the first using Infinera's

accused ROADMs sales, and the second using Infinera's WSS purchases.  *See supra*, Section I.C.

[5] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

The second alternative royalty base inappropriately relies on noninfringing purchase activity as an unreliable proxy, and arbitrarily assumes inventory to improperly includes pre-issuance purchases.

Purchasing is not an infringing act.  35 U.S.C. § 271.  Dr. Teece admits this.  *See* Ex. B, Teece Dep. at 87:19-88:18.  A damages base cannot rely on purchasing because "[a] reasonable royalty cannot include activities that do not constitute patent infringement."  *Enplas Display Device Corp. v. Seoul Semiconductor Co*, 909 F.3d 398, 411 (Fed. Cir. 2018) (internal quotations omitted).  Dr. Teece improperly assumes every WSS purchased in his second royalty base is sold in an infringing manner.  ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████  WSS purchases are an unreliable proxy for accused ROADM sales.  Nor is there a reliable reason to use them as a proxy, because Infinera produced ROADM sales information, on which Dr. Teece relies for his first royalty base.  *See id*. Ex. 10.a. To the extent Infinera purchased WSSs and included them in an accused ROADM sold in the U.S., those units already are reflected in Infinera's ROADM sales information and Dr. Teece's first royalty base.[6]  *See id*.  Dr. Teece's second damages base should be excluded on this basis alone.

Moreover, in the second alternative royalty base, Dr. Teece improperly includes hundreds of WSSs purchased before the Asserted Patent issued on March 17, 2020.  Ex. A, Teece Rep., Ex. 8.a, Columns [5] and [6]; Ex. B, Teece Dep. at 92:11-93:9.  This violates the Court's Report and Recommendation recommending precluding Capella from seeking pre-issuance damages.  Dkt.

---

[6] Dr. Teece also has no reliable basis to rely on "making" or "using" as infringing activities.  *See* Ex. B, Teece Dep. at 75:7-15. Infinera does not manufacture WSSs, and ███████████████████
████████████████████████████████████████████████████████████████████
███████████████████████

110.  It also contravenes equitable intervening rights, because to the extent any WSSs purchased before the Asserted Patent issued were sold in ROADMs after issuance, those purchases are "substantial preparation[s] . . . made before the grant of the reissue."  *See* 35 U.S.C. § 252.

Dr. Teece's contention that he "went back in time" to "capture all the units . . . made, used, or sold during the damages period" does not justify including pre-issuance purchases.  Ex. B, Teece Dep. at 94:21-96:6.  Again, Infinera produced post-March 17 ROADM sales information, on which Dr. Teece relies for his first royalty base.  Ex. A, Teece Rep., Ex. 10.a.  To the extent Infinera purchased WSSs before March 17, held them in inventory, and incorporated them into accused ROADMs sold after March 17, those units are already reflected in Infinera's post-March 17 sales information.  *See id.*  There is thus no reliable basis to include pre-March 17 WSS inventory.

In including pre-issuance WSS purchases in his second alternative damages base, Dr. Teece arbitrarily "[a]ssumes 6-months in inventory from the time the WSS part is purchased to the time the Accused Product is made, sold, offered for sale, or exported."  Ex. A, Teece Rep., Ex. 8.a n.13.  Dr. Teece cites no evidence supporting his this arbitrary assumption, instead referring to it as an "interim placeholder."  Ex. B, Teece Dep. at 93:10-94:6, 94:21-96:6, 97:16-98:2.[7]  Without reliable basis in facts or evidence in this case, the pre-issuance WSS purchases in Dr. Teece's second alternative damages base are unreliable and properly excluded.  *See, e.g.*, *Stragent*, 2014 1389304, at *4; *VirnetX*, 767 F.3d at 1331-34; *Uniloc*, 632 F.3d at 1319.

## III.    CONCLUSION

For the foregoing reasons, Defendants request that the Court grant Defendants' Motion to Exclude Dr. Knox and Dr. Teece's opinions be granted.

---

[7] An opportunity to supplement would not cure Dr. Teece's improper "placeholder."  Capella did not request Infinera's WSS inventory practices in discovery, or otherwise put Infinera on notice that Capella's damages theory would rely on inventory. *See* Ex. F-N.  Even if Capella did request such information in discovery, it never pressed the issue or moved to compel.

Dated: April 26, 2021

Melissa Richards Smith
State Bar No. 24001351
GILLAM & SMITH LLP
303 S. Washington Avenue
Marshall, Texas 75702
Telephone: (903) 934-8450
melissa@gillamsmithlaw.com

Respectfully submitted,

*/s/ Kurt Pankratz*

Kurt Pankratz (TX SBN 24013291)
E-mail: kurt.pankratz@bakerbotts.com
Melissa Muenks (TX SBN 24097442)
E-mail: melissa.muenks@bakerbotts.com
BAKER BOTTS LLP
2001 Ross Avenue, Suite 900
Dallas, TX 75201
Telephone: 214-953-6500
Facsimile: 214-953-6503

Sarah J. Guske (CA SBN 232467)
E-mail: sarah.guske@bakerbotts.com
BAKER BOTTS LLP
101 California St, Ste 3600
San Francisco, CA 94111-5843
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

John Frederick Gaustad (CA SBN 279893)
*Pro Hac Vice*
Email: john.gaustad@bakerbotts.com
BAKER BOTTS LLP
1001 Page Mill Road
Building One Suite 200
Palo Alto, Ca 94304
Telephone: 650-739-7500
Facsimile: 650-739-7699

Lauren J. Dreyer (DC 1007189)
*Pro Hac Vice*
Email: lauren.dreyer@bakerbotts.com
BAKER BOTTS LLP
700 K St NW
Washington, DC 20001
Telephone: 202-639-7700
Facsimile: 202-639-7890

Attorneys for Defendants INFINERA
CORPORATION, TELLABS, INC.,
TELLABS OPERATIONS INC., CORIANT
CORIANT (USA) INC.

16

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served via email on April 26, 2021.

*/s/  Kurt Pankratz*
Kurt Pankratz

**CERTIFICATE OF CONFERENCE**

I hereby certify that Defendants have complied with the meet and confer requirements set forth in Local Rule CV-7(h).  Counsel for Infinera Kurt Pankratz and John Gaustad met and conferred telephonically with counsel for Capella Robert Becker and Chad Everingham on April 26, 2021.  Capella indicated that it is opposed to the relief sought in this motion.

*/s/  Kurt Pankratz*
Kurt Pankratz

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that under Local Rule CV-5(d), the foregoing document is filed under seal pursuant to the Court's Protective Order entered in this matter.

*/s/  Kurt Pankratz*
Kurt Pankratz